Eddie G. CLEMONS

v.

**FORD MOTOR COMPANY d/b/a Nashville Ford Glass Plant.**

No. 3:98–0146.

United States District Court, M.D. Tennessee, Nashville Division.

Nov. 25, 1998.

---

Paul Toby Housch, Nashville, TN, for Eddie G. Clemons, plaintiffs.

Waverly David Crenshaw, Jr., Waller, Lansden, Dortch & Davis, Nashville, TN, Carey P. DeDeyn, Lisa Combs Foster, Amy K. Doyle, Sutherland, Asbill & Brennan, Atlanta, GA, for Ford Motor Company, a Delaware Corporation dba Ford Glass Plant, Nashville, defendants.

*MEMORANDUM*

HIGGINS, District Judge.

The Court has before it the defendant's motion (filed August 21, 1998; Docket En-

try No. 18) for summary judgment, its memorandum (filed September 18, 1998; Docket Entry No. 41) in support,[1] and the plaintiff's response (filed September 11, 1998; Docket Entry No. 32).

The Court has subject matter jurisdiction over the plaintiff's claims under 42 U.S.C. § 2000e–5(f)(3).

For the reasons set forth below, the Court shall grant the defendant's motion.

### I.

In 1971, the defendant, Ford Motor Company hired the plaintiff, Eddie G. Clemons, who is an African–American, to work in Ford's Nashville Glass Plant. Although the plaintiff has worked in various positions since being hired by Ford, his complaints of discrimination relate only to events that allegedly occurred from March 1997 to February 1998, while the plaintiff was working the afternoon shift in department 319 as a scratch polisher/seam repairer. During this period of time, the plaintiff's supervisor was Michael Hendricks and his foreman was Eddie Knox, who are both white.[2]

The plaintiff alleges in his complaint that on March 11, 1997, which was the plaintiff's first day of work as a polisher and repairer, Mr. Knox singled him out at work and told him to report on time from breaks and to not ride the "mule"[3] out of the department, even though white employees were allowed to use the mule to go to and from the department. Also on March 11, 1997, the plaintiff alleges that Mr. Hendricks demanded that the plaintiff remove his potato chips and coke from the work area, while white employees were not similarly disciplined.

The plaintiff alleges that on March 14, 1997, Mr. Hendricks accused him of allowing six damaged pieces of glass to enter the shipping box, even though Mr. Hendricks was aware that the plaintiff had not been on the job long enough during that shift to inspect the glass. The plaintiff alleges that Mr. Hendricks made him sort out the defective glass, issued him a written reprimand and warning, and sent him home for the night without pay. The plaintiff alleges that Mr. Hendricks has allowed several white employees to stay on the job and has not issued them written reprimands after allowing defective glass to enter the shipping box.

The plaintiff further alleges that on May 31, 1997, he was accused of being nine minutes late to work, and that another black employee was similarly accused, and that Mr. Hendricks issued both of them a written warning. Additionally, Mr. Hendricks docked the plaintiff fifty minutes in pay. The plaintiff alleges that white employees are not similarly disciplined for arriving to work late.

The plaintiff filed grievances as to these incidents through his union. On August 19, 1997, the United Auto Workers civil rights committee, consisting of the plaintiff's co-workers and union representatives, found that there had been continuing harassment by Mr. Hendricks and a violation of the plaintiff's civil rights. The defendant denied that there was any such harassment or violation.

The plaintiff alleges that on September 20, 1997, he was scheduled to work a sec-

---

**1.** The defendant originally filed its memorandum in support on August 21, 1998 (Docket Entry No. 19), but on September 15, 1998, the defendant filed a motion (Docket Entry No. 39) to substitute and file with the Court another memorandum in support of its motion for summary judgment in order to correct typographical errors and margin spacing. The Court granted the motion, *see* order (entered September 21; 1998; Docket Entry No. 40), and the defendant filed a second memo-

randum on September 18, 1998 (Docket Entry No. 41).

**2.** In March of 1998, Mr. Hendricks was moved out of department 319 and thus no longer supervises the plaintiff. The plaintiff continues to work in department 319.

**3.** A mule is a piece of equipment used to transport glass.

ond shift as overtime, which was authorized by the supervisor on duty, Jeff Blackford. However, the plaintiff contends that after he began the second shift, Mr. Hendricks ordered the plaintiff home and told him he could not work double shifts, even though Mr. Hendricks had allowed white employees to work second shifts as overtime. The plaintiff also alleges that on September 28, 1997, he arrived at work five minutes late and was told by Mr. Hendricks that he had already given out the work assignments and thus the plaintiff was sent home.

On November 19, 1997, the plaintiff filed a charge of discrimination against Ford with the Equal Employment Opportunity Commission, alleging that he had been harassed and treated differently from other employees on account of his race. The EEOC did not conduct an investigation or make any determination concerning the plaintiff's allegations, but issued the plaintiff a dismissal and a notice of rights. On January 8, 1998, after appealing his grievance through the third stage of the grievance process, a committee consisting of Ford and union representatives reached a disposition of the plaintiff's grievance. As part of the disposition, Mr. Hendricks was instructed to participate in a training seminar on equal application and conflict resolution and undergo periodic observation.

The plaintiff filed this action on February 19, 1998, alleging claims of disparate treatment, hostile work environment, and retaliation under Title VII and the Tennessee Human Rights Act. The defendant moves for summary judgment on the grounds that (1) the plaintiff cannot establish a prima facie case of disparate treatment in the work place on the basis of race under Title VII or the THRA; (2) the plaintiff cannot establish a hostile work environment claim because the alleged harassment involved no racial content and

was not severe or pervasive; and (3) the plaintiff cannot establish a prima facie case of retaliation under Title VII or the THRA.

## II.

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact concerning an essential element of the opposing party's action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.*, 921 F.2d at 1349; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." [4] *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the plaintiff's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party

---

**4.** The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.*, 921 F.2d at 1349. The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip., Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

### III.

### A. UAW Civil Rights Committee Finding and Disposition of Grievance

■ As an initial matter, the Court will address the plaintiff's contention that the UAW committee finding concerning his grievance against Mr. Hendricks and the final disposition of his grievance are binding on the defendant. The plaintiff also contends that the "disposition of the racial discrimination grievance against HENDRICKS is an admission by FORD that CLEMONS had been discriminated against." Plaintiff's memorandum (Docket Entry No. 32) at 34.

The plaintiff filed a grievance through the union on April 4, 1997, less than a month after coming under Mr. Hendricks' supervision, alleging that he was being racially discriminated against by Mr. Hendricks with regard to the time he starts work and the way he inspects and repairs glass. Plaintiff's response to defendant's statement of undisputed facts (filed September 11, 1998; Docket Entry No. 36) ¶ 45. The committee issued its decision on August 18, 1997, and stated that:

> We, as the Civil Rights Committee, after hearing Eddie Clemons statements concerning Supervisor Mike Hendricks actions have determined that there has been continuing harassment and a violation of Eddie Clemons Civil Rights. This can be verified by Eddie's co-workers. A Grievance has been filed on behalf of Eddie Clemons in reference to Supervisor Hendricks violation of Article 10, Section, 9 of the Master Agreement.

Complaint (filed February 19, 1998; Docket Entry No. 1) attachment at exhibit C.

It is undisputed that the UAW civil rights committee that reviewed the plaintiff's grievance was comprised of six of the plaintiff's co-workers and union representatives but no representatives of the company. Plaintiff's response to defendant's statement of undisputed facts (Docket Entry No. 36) ¶ 46. Furthermore, the committee never talked to Mr. Hendricks concerning the plaintiff's grievance, only met with the plaintiff for about 30 minutes,[5] and then issued its decision that there had been harassment and that the plaintiff's civil rights had been violated. *Id.* ¶ 47. Based on such information, it appears that the committee's decision was wholly unsupported. Such conclusory opinions of a plaintiff's co-workers, and in this case, union representatives, does not create a genuine issue of material fact. *See O'Shea v. Detroit News*, 887 F.2d 683, 688 (6th Cir. 1989) (holding that statements of co-workers and union official that employer made unfavorable shift assignments on the basis of age and was gathering data on older

---

5. The committee also called Butch Stokes, the union bargaining committee representative for the plaintiff and asked him questions about the grievance. Notice of filing discovery materials (filed August 21, 1998; Docket Entry No. 28) attachment thereto, Stokes' deposition at 58.

employees was insufficient to create a factual issue precluding summary judgment); *Young v. State Farm Mut. Auto. Ins. Co.,* 868 F.Supp. 937, 945–46 (W.D.Tenn.1994) (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 585 (6th Cir.1992) in finding that "[p]laintiff's evidence essentially amounts to her personal belief, and that of her co-workers, that she was discriminated against on the basis of age. Conclusory allegations of discrimination are insufficient to withstand a motion for summary judgment ... plaintiff must point to some factual support in the record behind her and her co-workers' allegations of age discrimination").[6]

Furthermore, the plaintiff makes a similar argument with regard to the final disposition of his grievance at the third stage of the grievance process after the union appealed the defendant's denial of racial discrimination. The disposition stated:

> The Company reaffirms its commitment to comply with the Company's Equal Employment Opportunity Policy, to insure employees receive equal treatment in the administration of the UAW/Ford contractual provisions, to investigate claims of harassment promptly and thoroughly, and take timely and appropriate corrective action as necessary.

> Accordingly, the Supervisor involved in the instant case will participate in Ford sponsored training (within the first quarter of 1998) on the subject of equal application and conflict resolution.[7] This Supervisor will also undergo periodic observation to safeguard against future instances of this nature from occurring.

Complaint (Docket Entry No. 1) attachment at exhibit D.

This disposition occurred during a meeting among Ford's representative and labor relations superintendent, Connie Bond, the union's local and international representatives, which included Johnny Martin, the bargaining chairman for the union, and the human resources manager to discuss "whatever grievances were on the agenda." Notice (Docket Entry No. 38) tab 4, Bond deposition at 35. Ms. Bond testified that the disposition of the grievance did not result in a finding that the plaintiff had been discriminated against or harassed, nor did it constitute an acknowledgment by Ford that there was any discriminatory harassment by Mr. Hendricks against the plaintiff. *Id.* at 38, 48.

Ms. Bond also testified that the resolution of the grievance at the third stage of the grievance process is "an internal way to resolve issues, to negotiate resolution of several issues, ... it's a political process, and this was dispositioned by the HR manager the way it was." *Id.* at 38. Mr. Martin also confirmed that it is a "negotiation process" in which there is "some back and forth discussion and some give and take on both sides." Notice (Docket Entry No. 28) attachment thereto, Martin deposition at 46. Based on such evidence, the Court agrees with the defendant that the disposition "was the result of a bargaining process to settle disputes between the company and its employees and does not constitute a finding or admission that Plaintiff has been discriminated against." Defendant's memorandum (Docket Entry No. 41) at 16. *See* Fed.R.Evid. 408 ("Evidence of conduct or statements made in compromise negotiations is likewise not

---

**6.** The plaintiff argues that because "FORD is a contractual party to the UAW Contract Local Agreement," the decision of the civil rights committee is "binding on FORD in these proceedings." Plaintiff's memorandum (Docket Entry No. 32) at 32. The plaintiff cites no authority in support of its proposition. Accordingly, the Court finds that even if the committee's decision is binding on Ford in its day-to-day management activities, it is in no way binding on this Court in its consideration of the defendant's motion for summary judgment.

**7.** Ms. Bond testified that "we all go through personal development training, and this was an area where it was felt Mr. Hendricks could use additional training." Notice (Docket Entry No. 38) tab 4, Bond deposition at 49.

admissible."). Accordingly, the Court will consider the defendant's motion for summary judgment on the plaintiff's claims of disparate treatment, hostile work environment and retaliation under the legal framework of Title VII set forth in the case law.

## B. Prima Facie Case of Disparate Treatment

Title VII provides that it is unlawful for an employer to discriminate against any individual on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). In the ·absence of direct evidence, discrimination in violation of Title VII can be established through the use of indirect evidence, as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973).[8]

Using the *McDonnell Douglas* framework, ʼa plaintiff seeking to establish a prima facie case of disparate treatment under Title VII must show that (1) he was a member of the protected class; (2) he was subjected to an adverse employment action; (3) at the time of the adverse employment action, he was qualified for the position; and (4) a comparable non-protected person was treated better. *Mitchell,* 964 F.2d at 582. The fourth

element has been interpreted as requiring the plaintiff to establish "that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Id.* at 583.[9]

In this action, Ford does not dispute that Mr. Clemons can establish the first and third elements of his prima facie case. It does dispute that Mr. Clemons was either subject to an adverse employment action in each circumstance or that Ford treated a comparable non-protected person differently.

### 1. adverse employment action

▮ The defendant claims that with regard to the plaintiff's complaints about being told not to eat at work, not to misuse company equipment (the "mule"), and not to be late,[10] these incidents do "not rise to the level of an adverse employment action and therefore [are] not cognizable under Title VII." Defendant's memorandum (Docket Entry No. 41) at 14. The Court agrees.[11]

In *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987), the Sixth Circuit held that the employer's failure to properly document sick leave and the plaintiff's transfer and demotion in which she received the same salary and benefits did not constitute an adverse employment action. *See Fer-*

---

8. Although discrimination can also be established through the use of direct evidence, as set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794–95, 104 L.Ed.2d 268, 293 (1989), ·and Mr. Clemons states that he "relies alternatively upon the direct and circumstantial methods of proving that FORD violated his right to be free from racial discrimination as an employee of FORD," the plaintiff sets forth no direct evidence of racial discrimination. Plaintiff's memorandum (Docket Entry No. 32) at 22.

9. The defendant only argues that the plaintiff cannot establish a prima facie case of racially disparate treatment. Accordingly, the Court will not discuss the analysis involving a legitimate nondiscriminatory reason and pretext which follows if the plaintiff is able to establish a prima facie case. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1824–25, 36 L.Ed.2d at 678–79.

10. The plaintiff concedes that he "filed a grievance concerning HENDRICKS' actions in sending him home without pay after arriving ten (10) minutes late for a flat tire, and that the grievance resulted in CLEMONS being reimbursed for the time lost because of HENDRICKS' disciplinary action." Plaintiff's memorandum (Docket Entry No. 32) at 31. Accordingly, any adverse employment action suffered by the plaintiff was remedied by Ford.

11. In his response, the plaintiff focuses his argument with regard to these incidents on his being treated differently from white employees, but does not address the defendant's contention that these incidents do not rise to the level of an adverse employment action.

*guson v. E.I. duPont de Nemours and Co., Inc.,* 560 F.Supp. 1172, 1201 (D.Del.1983) (cited by *Yates* for holding that the plaintiff's transfer was temporary, resulted in no pay or benefits reduction, and thus no adverse action was established and the plaintiff had failed to prove her prima facie case); *Taylor v. Fed. Deposit Ins. Corp.,* 132 F.3d 753, 765 (D.C.Cir.1997) (citing *Yates* in holding that "what defeats these claims (besides want of a prima facie case) is not that the denials complained of were mediate but that they were minor. The federal courts cannot be wheeled into action for every workplace slight, even one that was possibly based on protected conduct"). Based on this case law, the Court finds that the plaintiff's complaints regarding eating in the work place, misusing the "mule," and tardiness do not rise to the level of an adverse employment action.

Viewing all facts in the light most favorable to Mr. Clemons, the Court finds that with regard to the second element of his prima facie case and these specific incidents, he has not established the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

### 2. treatment of similarly-situated non-minority employees

In order to establish the fourth element of his prima facie case, Mr. Clemons must show that for the same or similar conduct, Ford treated him differently from similarly situated non-minority employees.

> [T]o be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell,* 964 F.2d at 583 (citations omitted); *see also, Harrison v. Metro. Gov't,* 80 F.3d 1107, 1115 (6th Cir.), *cert. denied,* 519

U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996) (citing *Mitchell* ).

### a. disciplinary actions

The defendant argues that the plaintiff cannot prove that similarly situated white employees were disciplined less severely with regard to the written reprimand and warning that the plaintiff received on March 14, 1997, for allowing bad glass to enter the shipping box. Mr. Clemons testified in his deposition that five white employees, including Darby Blair, Jerry Baker, Troy Vaughn, Georgia Dobbs, and Larry Watkins allowed bad glass to enter the shipping box and were only given a verbal warning. Notice (Docket Entry No. 28) attachment thereto, Clemons' deposition at 159–60. However, Mr. Clemons testified that "[e]ach one of them *during their training period* has allowed bad glass to enter the box." *Id.* at 160 (emphasis added). The defendant argues that these five individuals were in their training period when they allowed bad glass to enter the shipping box, while the plaintiff "had held the TC & E Operator position under Hendricks' supervision prior to March of 1997 and thus was not in a 'training period' when he was disciplined." Defendant's memorandum (Docket Entry No. 41) at 12. In his response, the plaintiff does not address this distinction between his situation and the situation of the five employees who were allegedly treated differently. Accordingly, the Court finds that the five white individuals were not similarly situated.

The plaintiff also asserts that Mr. Hendricks failed to formally discipline another white employee, Phillip Cox, for not performing his job. The defendant acknowledges that union representative Gene Widener testified that around the same time the plaintiff received the reprimand and warning from Mr. Hendricks, Mr. Hendricks had also accused Mr. Cox of not performing his job, but only gave him a verbal warning. However, Mr. Widener could not remember the particulars of Mr. Cox's situation, and in comparing Mr.

Cox's punishment to the plaintiff's, Mr. Widener stated that "every case is an individual case" and it depends on the facts of the case. Notice (Docket Entry No. 28) attachment thereto, Widener deposition at 20. The Court finds that such information is insufficient to establish Mr. Cox as a similarly situated employee. The plaintiff has failed to provide specific facts regarding Mr. Cox's situation. *See Brown v. Babcock & Wilcox Co.*, 936 F.2d 572, 1991 WL 112813, at *5 (6th Cir.1991) ("None of [the plaintiff's] facts are sufficiently specific to support an inference of discriminatory application of [the defendant's] rules."). Accordingly, the Court finds that the plaintiff cannot establish a prima facie case of disparate treatment with regard to disciplinary actions.

### b. attendance

▮ The defendant also argues that the plaintiff fails to set forth a similarly situated white employee who was treated differently with regard to attendance issues. The plaintiff testified that on April 10, 1997, he was told by Mr. Hendricks that if he did not arrive to work earlier, he would be disciplined. The plaintiff testified that on that same day, Donald Frete,[12] a white employee, arrived to work late and walked past the plaintiff and Mr. Hendricks, and Mr. Hendricks did not say anything to Mr. Frete. The plaintiff, however, was unaware as to whether Mr. Hendricks said

anything to Mr. Frete about his tardiness outside of the presence of the plaintiff. Notice (Docket Entry No. 28) attachment thereto, Clemons' deposition at 181–82. Moreover, the plaintiff was not disciplined on this occasion other than Mr. Hendricks' verbal warning to him. *Id.* at 182.

The plaintiff also alleges that on February 12, 1998, Mr. Frete arrived to work late and Mr. Hendricks said nothing as Mr. Frete walked by them. *Id.* at 227. Again, the plaintiff was unaware of whether Mr. Hendricks disciplined Mr. Frete outside of his presence. The plaintiff is unable to establish that Mr. Frete was not disciplined by Mr. Hendricks on either of these occasions. *Id.* at 230. Moreover, the plaintiff has not provided any information as to Mr. Frete's attendance history and, thus, has not established that he and Mr. Frete were similarly situated with regard to their attendance records.[13],[14]

Accordingly, the Court finds that the plaintiff has not established a prima facie case of disparate treatment with regard to attendance.

### c. overtime

▮ The defendant also argues that the plaintiff cannot show that he was similarly situated with white employees on the two occasions he was denied overtime by Mr. Hendricks. The plaintiff asserts that on March 20, 1997, and September 20, 1997,

---

**12.** Although the defendant refers to a Donald "Frakes," defendant's memorandum (Docket Entry No. 41) at 13, the Court assumes that the defendant is referring to Donald Frete.

**13.** The plaintiff also argues in his memorandum that a white employee named Jerry "Drake" had been late on several occasions and was not sent home by Mr. Hendricks. Plaintiff's memorandum (Docket Entry No. 32) at 30. However, the plaintiff testified in his deposition that Jerry *Baker*, a white employee, had been late approximately four times "in the month of March" but was allowed to work his overtime shift. Notice (Docket Entry No. 28) attachment thereto, Clemons' deposition at 20. Again, the plaintiff fails to provide any specific information, including dates or Mr. Baker's attendance history. Furthermore, the plaintiff was un-

aware whether Mr. Hendricks disciplined Mr. Baker outside his presence or docked his pay on any of these occasions.

**14.** The plaintiff admitted in the statement of undisputed facts that "[a]fter Plaintiff arrived late several times, Hendricks began making notes of Plaintiff's tardiness in accordance with his practice of documenting recurring attendance problems. These notes (which did not record *every* occasion—only when Hendricks remembered or had time) indicate that Plaintiff either arrived late to work, left early, or returned late from break at least six different times between March 11 and May 31 of 1997." Plaintiff's response to defendant's statement of undisputed facts (filed September 11, 1998; Docket Entry No. 36) ¶ 27 (citations omitted).

he was denied the opportunity to work overtime even though he had been approved to work the overtime shifts by Jeff Blackford, another supervisor. The plaintiff testified that both overtime shifts were in the scratch polish/seam repair department, and that Mr. Hendricks would not allow him to complete the shifts because employees were allegedly not allowed to work 16 hours. Notice (Docket Entry No. 28) attachment thereto, Clemons' deposition at 164, 191–92. The plaintiff argues, however, that white employees were allowed to work 16 hours and get overtime. The plaintiff testified that Mr. Blair had been allowed to work 16 hours as a knob applicator and that Mr. Baker had been permitted to work 16 hours as a conveyor equipment operator. *Id.* at 166–167, 169, 172.

The defendant asserts that "[p]lant supervisors had been instructed not to permit employees to work more than 12 hours unless production would be adversely affected." Defendant's memorandum (Docket Entry No. 41) at 14. Thus, the defendant argues that Mr. Blair and Mr. Baker were not similarly situated with the plaintiff when they were permitted to work 16 hours because they were scheduled for work in essential production line positions, while the plaintiff was scheduled to work in the scratch polish/seam repair department, which did not affect production.

Mr. Hendricks testified that "[n]o one would work over 12 hours unless it impacted the shift, the production.... If it was going to shut a line down, they could." *Id.*, Hendricks' deposition at 70. Mr. Hendricks testified that repair jobs did not impact the production lines. Mr. Blackford apparently scheduled the defendant to work the overtime shift which involved repairs, and Mr. Blackford was supposed to be the supervisor for that shift. However, Mr. Hendricks had to cover for Mr. Blackford during the overtime shift because Mr. Blackford was not at work. Mr. Hendricks testified that when he realized that the plaintiff was working a 16–hour

shift, he sent him home because Mr. Hendricks was "accountable for the people that work over 12 hours," and it would be reflected on Mr. Hendricks' time sheet. *Id.*, at 73.

Mr. Knox also testified that "[t]he plant manager put a letter out on [working overtime], and we have to abide by that." *Id.* Knox deposition at 50. He testified that the policy allows for a total of 12 hours work with four hours of overtime, and 16 hours are allowed in "emergency situations." *Id.* Mr. Knox testified that he recalled one occurrence during the relevant time period when Mr. Hendricks would not allow the plaintiff to work a 16–hour shift. Mr. Knox testified that the plaintiff

> come and asked me, said that Mr. Blackford had told him he could work 16 hours and—on repairs, and that wasn't what the letter stated we were doing, and I informed him that we could not do that, and I also talked to Mr. Blackford the next morning about it, that we could not do that, and that's the only time I remember.

*Id.* at 51–52. Johnny Martin, the bargaining chairman for the union, also testified that "our basic agreement leads us to a 12 hour overtime schedule, or 12 hour daily schedule, not to exceed 12 hours. There are certain situations or circumstances that may occur that would require a person, or allow a person to work 16 hours to—in order to comply with the agreement." *Id.*, Martin deposition at 55.

Based on the above evidence, the Court finds that the plaintiff was not similarly situated with the white employees that were permitted to work 16–hour shifts on a production line. Moreover, the Court notes that Connie Bond, the labor relations supervisor for hourly employees, stated in her declaration that:

> The time records show that, for the period of June 1, 1997 to March 15, 1998 (the approximate date that Michael Hendricks ceased to be a supervisor of Eddie Clemons), Eddie Clemons worked

fifteen shifts of 16 hours, one shift of 17 hours, and one shift of 14.5 hours. Michael Hendricks authorized nine of these shifts. The records also show that Eddie Clemons worked more 16–hour shifts during this time period than any other employee on the afternoon shift in Dept. 319. (The next closest employee is L.B. Darby, who worked ten 16–hour shifts.) Appendix (filed August 21, 1998; Docket Entry No. 20) tab G, ¶ 5. It is clear, based on this information, that for the same or similar conduct, the plaintiff was not treated differently from similarly situated non-minority employees.[15]

As Mr. Clemons has not presented sufficient evidence that similarly situated employees who engaged in conduct of a similar nature were treated more favorably, he has failed to establish the existence of a genuine issue of material fact as to the fourth element of his prima facie case. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. Accordingly, the defendant's motion for summary judgment on the plaintiff's disparate treatment claim shall be granted.

### C. Racially Hostile Work Environment

▮ The defendant argues that the plaintiff's claim of racial harassment must fail because he cannot establish a prima facie case of a racially hostile work environment.[16] Specifically, the defendant ar-

gues that the conduct of which the plaintiff complains was devoid of racial content, did not occur "because of" the plaintiff's race, and was not severe or pervasive. Defendant's memorandum (Docket Entry No. 41) at 17–18.

▮ In *Harrison,* the Sixth Circuit considered the plaintiff's claim that he was the victim of racial harassment and applied the standards applicable to a hostile work environment claim. The Court noted that the Supreme Court has held that "for harassment to be actionable, 'it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Harrison,* 80 F.3d at 1117 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49, 60 (1986)). The "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60 (citation omitted).

▮ Moreover, the Supreme Court has held:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title

---

**15.** The plaintiff argues that he has "disputed the payroll records as being accurate" and cites generally to his affidavit. Plaintiff's memorandum (Docket Entry No. 32) at 28. Although the defendant moves to strike the affidavit for consisting of legal opinions (defendant's motion to strike, filed September 25, 1998; Docket Entry No. 42), the issue in question concerns facts and not legal conclusions. Thus, the Court has reviewed the plaintiff's affidavit and finds that the plaintiff's only dispute is with Connie Bond's statement that the plaintiff "had turned down the opportunity to work a 16 hour shift on September 15, 1997 and again on September 19, 1997." Affidavit of Clemons (filed September 11, 1998; Docket Entry No. 34) ¶ 10. Mr. Clemons nowhere disputes that he worked more 16–hour shifts than any other employee,

white or black. Accordingly, the Court finds no genuine issue of material fact exists as to the number of 16–hour shifts that Mr. Clemons worked.

**16.** The plaintiff argues in his memorandum that he "can proceed under either of two theories in pursuing his claim of racial harassment, either *quid pro quo* or hostile work environment." Plaintiff's memorandum (Docket Entry No. 32) at 34. However, there is no quid pro quo theory of harassment in the racial discrimination context. *See Lattimore v. Polaroid Corp.,* 99 F.3d 456, 463 (1st Cir.1996) ("While the concept of quid pro quo harassment has no application to race discrimination cases, the concept of hostile environment harassment does.").

VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302 (1993). In determining whether an environment is hostile or abusive, all of the circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [ ] whether it unreasonably interferes with an employee's work performance" and the "effect on the employee's psychological well-being." *Id.* at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302–03. Consideration of the totality of the circumstances is important but no one factor is required. *Id.*

 In the instant case, the Court finds that the conduct of which the plaintiff complains was not severe or pervasive enough to create an objectively hostile or abusive work environment. The plaintiff's allegations include being told to report on time from a break, being told not to ride the mule, being criticized and reprimanded for poor workmanship, and not being allowed to complete a 16-hour overtime shift. *See* plaintiff's memorandum (Docket Entry No. 32) at 37. In considering the factors above, the Court agrees with the defendant that the incidents alleged by the plaintiff were "brief, few in number, not objectively degrading or humiliating, and devoid of any racial content."[17] Defen-

dant's memorandum (Docket Entry No. 41) at 18. *See Booker,* 17 F.Supp.2d at 745–46 (holding that harassment was frequent, severe, and humiliating during ten-month period in which plaintiff suffered verbal harassment from supervisor on at least twelve occasions, supervisor did not deny frequently cursing at plaintiff, and supervisor "was so loud and hostile towards [plaintiff] that customers and other employees became concerned"); *Wemimo,* 1998 WL 709605, at *5 (holding that even if supervisor remarked to plaintiff at company picnics held every two months that he "sit down and eat potato chips like slavery days" such a comment would be "inadequate to meet the 'pervasive or severe' prong of *Meritor* )". Accordingly, the Court finds that the alleged conduct in this case was not so severe or pervasive as to unreasonably interfere with the plaintiff's work performance and create an objectively hostile or abusive work environment; thus, the alleged conduct is beyond the purview of Title VII. The defendant's motion for summary judgment on the plaintiff's racial harassment claim shall be granted.

### D. Prima Facie Case of Retaliation

The plaintiff also claims that he was subjected to an adverse employment decision in retaliation for opposing an unlawful employment practice. Title VII makes it unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).

---

**17.** The plaintiff alleges that Mr. Knox referred to him as a " 'youngin,' a term he had used before in reference to black employees." Plaintiff's memorandum (Docket Entry No. 32) at 37. Mr. Knox apparently used that term in reference to white employees as well, *see infra* at 26, and thus, the Court finds an absence of racial slurs or derogatory remarks. *See Booker v. Budget Rent–A–Car Sys.,* 17 F.Supp.2d 735, 743–44 (M.D.Tenn.1998), (noting that in the plaintiff's racial harassment claim, there was evidence from employees that the supervisor referred to the plaintiff

as his "whipping boy" and made racially derogatory remarks on several instances, including statements that blacks were typically lazy and slow and that he wanted to "get rid of the 'niggers' " and hire Vietnamese workers who worked harder); *Wemimo v. Personal Marketing Co.,* No. 97–2544–JWL, 1998 WL 709605, at *5 (D.Kan. Sept.28, 1998) (holding that plaintiff's allegations of being called a "time bomb," being told he "worked like a dog," and repeatedly being told "[h]ey, *you,* go back to work," did not constitute harassment stemming from racial animus).

■ To make out a prima facie case of retaliation, the following elements must be established:

(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Harrison,* 80 F.3d at 1119. The defendant argues that the plaintiff cannot establish the existence of genuine issue of material fact with regard to whether the defendant took an employment action adverse to him.[18]

■ In the defendant's interrogatories to the plaintiff, the defendant asked the plaintiff to

[d]escribe in detail the basis for your allegations in Paragraph 22 of your Complaint that Ford has permitted Michael Hendricks to continue discriminating against you and has retaliated against you, including all facts relied upon by you in support of these allegations, the identity of each person having any knowledge or information concerning the facts relied upon by you in support of these allegations, together with a brief description of the substance of each person's knowledge or information, and the identity of all documents which evidence, support, or refute these allegations.

Appendix (Docket Entry No. 20) tab A, ¶ 8. The plaintiff responded that:

Following the filing of the E.E.O.C. charges, grievance, and the disposition of the grievance process, the Defendant Ford Motor Company has permitted its supervisor, Mr. Michael Hendricks to continue to practice discrimination against me. Specifically, on 2–10–98, Mr. Michael Hendricks came to my work station and stated he wanted Mr. Green and I to be working at all times. He stated that you are the worse employees I have in Department 319. Mr. Hendrick[s] also spoke very harsh to me and Mr. Green because we are black employees. However, Mr. Hendrick[s] talks to white employees with the highest of respect.

Defendant Motor Company has removed Mr. Hendricks from Department 319 to avoid any further contact with me or Mr. Green.

*Id.* at answer to interrogatory # 8. The Court agrees with the defendant that such statements or behavior without more does not constitute an adverse employment action. In *Triplett v. Electronic Data Systems (EDS),* 710 F.Supp. 667 (W.D.Mich. 1989), *aff'd,* 900 F.2d 260 (6th Cir.1990), the court held with regard to the plaintiff's discriminatory discharge claim under Title VII that

[w]hile plaintiff may rightly complain that she was treated discourteously by defendant Kremer, no facts have been presented to support a finding that the tension was related to racial differences. The statutes under which plaintiff seeks redress for race discrimination are designed for that limited purpose; they do not provide a shield against all harsh treatment in the work place.

*Id.* at 672. *See also* discussion at 12 concerning *Yates,* 819 F.2d at 638. Accordingly, the Court finds that with regard to Mr. Hendricks, no adverse employment action occurred.

In addition, the Court notes that the plaintiff has alleged that Mr. Knox also participated in the retaliation. However, the only action that the plaintiff mentions with regard to Mr. Knox is that he "referred to the CLEMONS as a 'youngin', a term used by KNOX in reference to black employees in the past." Plaintiff's memo-

---

**18.** The defendant also challenges the second and fourth prongs of the prima facie case. As the Court finds that the plaintiff fails on the third prong, it will not address the other prongs contested by the defendant.

randum (Docket Entry No. 32) at 40. The Court initially notes that on its face, the term "youngin" is devoid of racial content. The plaintiff has testified that he considers the term a racial slur because Mr. Knox "used that expression only in regards to black people." Notice (Docket Entry No. 28) attachment thereto, Clemons deposition at 237. However, Ms. Bond stated in her declaration that "[p]roduction superintendent Eddie Knox has referred to me as "young un" in the past. I am white." Appendix (Docket Entry No. 20) tab G, ¶ 16. Based on this evidence, the Court finds that, even if Mr. Knox called the plaintiff a "youngin," it does not constitute an adverse employment action. Accordingly, the Court finds that the plaintiff cannot establish a prima facie case of retaliation, and the defendant's motion for summary judgment on this issue shall be granted.

## IV.

The Court shall grant the defendant's motion for summary judgment on the plaintiff's Title VII claims of disparate treatment, hostile work environment, and retaliation. Accordingly, as the Court dismisses with prejudice the federal claims, it declines to exercise supplemental jurisdiction over the plaintiff's pending state claims under the THRA. *See* 28 U.S.C. § 1367(c)(3); *see also Cameron v. Seitz,* 38 F.3d 264, 276 (6th Cir.1994) ("With the dismissal of the [federal] claim, original jurisdiction over the state ... claim is lacking, and the district court has discretion as to whether to continue to exercise supplemental jurisdiction over it."). Thus, the Court shall dismiss without prejudice the plaintiff's state law claims.

An appropriate order will be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the defendant's motion (filed August 21, 1998;

1. The defendant's motion (filed September 25, 1998; Docket Entry No. 42) to strike the

Docket Entry No. 18) for summary judgment is granted.[1]

Accordingly, the plaintiff's federal claims under Title VII are dismissed with prejudice. The plaintiff's state law claims under the Tennessee Human Rights Act are dismissed without prejudice.

The entry of this order shall constitute the judgment in this action.

It is so ORDERED.

affidavits of Eddie G. Clemons and Michael A. Green is deemed moot.