936 F.2d 572
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James A. BROWN, Plaintiff-Appellant,
v.
The BABCOCK & WILCOX COMPANY, Defendant-Appellee.
 No. 90-3918.
 United States Court of Appeals, Sixth Circuit.
 June 26, 1991.
 
 Edward L. Gilbert, Akron, Ohio, for plaintiff-appellant.
 Theodore O. Rogers, Jr., Rex H. Elliott, Sullivan & Cromwell, New York City, for defendant-appellee.
 On Appeal from the United States District Court for the Northern District of Ohio, No. 89-02511.
 N.D.Ohio
 AFFIRMED.
 Before KRUPANSKY and BOGGS, Circuit Judges, and DUGGAN, District Judge.*
 PER CURIAM.
 
 
 1
 James Brown, a black male, appeals from the district court's grant of Babcock & Wilcox's ("B & W") motion for summary judgment. Summary judgment was entered for B & W on all four of Brown's claims: racially discriminatory discharge in violation of Title VII of the Civil Rights Act of 1964, racially discriminatory discharge in violation of 42 U.S.C. Sec. 1981, breach of contract in violation of Ohio law, and intentional infliction of emotional distress in violation of Ohio law. For the following reasons, we affirm the district court in all respects.
 
 
 2
 * Brown was fired from his job as a welder with B & W on June 22, 1988. Brown was fired for committing at least three violations of B & W's Rule C-7. That rule reads in pertinent part as follows:
 
 Group C
 
 3
 Any instance of the conduct listed in Group C below can result in a written warning. A later instance of the same conduct can result in a suspension without pay. A still later occurrence of the same conduct listed below can result in discharge.
 
 
 4
 * * *
 
 
 5
 * * *
 
 
 6
 7. Poor workmanship or habits.
 
 
 7
 Violations are wiped off the employee's record if the employee goes one year without committing another violation of the same rule. Brown does not contend that the policy itself violates the law.
 
 
 8
 Brown was operating a new robotic welding machine, model 1152, when he was fired. He had previously worked for twenty-five years for B & W, mostly on a non-robotic, subarc welding machine, model 1041. Brown switched machines in 1987 when, in accordance with established procedure, he bid for a position on the 1152 machine. Brown received the position because he was one of the most senior qualified welders bidding. Brown was given seven weeks of training on the new 1152 machine before entering the new position.
 
 
 9
 Brown's first written[1] warning concerning a violation of Rule C-7 occurred on December 14, 1987. He was given a written warning for continuing a weld past two hold points, where an inspector was supposed to inspect the weld. Brown received a letter from B & W after this warning explaining that two more violations resulting in written warnings could result in his discharge. B & W subsequently gave Brown an additional week of training on the 1152 machine.
 
 
 10
 Brown received his second written warning on February 25, 1988, for permitting his weld to be made out of alignment. He was suspended for three days without pay, and received a letter from B & W informing him that another violation could lead to his termination. In addition, Brown was verbally informed that another violation could result in his termination. Brown resisted requests that he return to operating the 1041 machine, and received another week of training on the 1152 machine.
 
 
 11
 Brown's final violation occurred on June 15, 1988. He operated his welding machine without a tip, contrary to regulations. He then shut the machine down because he could not determine what was wrong with it, and called over the robotic programmer to determine what was wrong. Brown was fired after a company investigation.
 
 
 12
 Brown filed a grievance under the collective bargaining agreement ("CBA") alleging that he was unjustly discharged in violation of the terms of the CBA, even though he had not challenged either of his two prior written warnings. Brown did not allege that he was fired because of his race at any point during the grievance process. Instead, he argued that his supervisor was giving him written warnings that he did not merit because Brown exercised his right under the CBA to refuse overtime and weekend work. An arbitrator eventually heard his grievance, and ruled that B & W had "just cause" under the CBA to fire Brown. Brown then alleged for the first time that he was fired because of his race when he filed a charge with the Equal Employment Opportunity Commission ("EEOC"). Brown filed this suit after the EEOC found his claim to be meritless.
 
 
 13
 Brown alleges that because he was black he was punished for welding errors that did not lead to punishment for white welding operators. Brown contended in his deposition for this case that his immediate supervisor harassed him and examined his work more harshly than that of white operators. Brown also contends that, although all 1152 operators operate 1041 machines at times, he was assigned to the task more frequently than were white operators. He alleged that a white operator named Briggs was not punished for a weld that consisted of "bad welding beads" and "was messed up all the way around." He provided no additional details about any of these incidents, and provided no specific instances of discriminatory actions by any of his supervisors.
 
 
 14
 Brown also submitted an affidavit by a union official, Stephen Mook, in support of his claims. Mook makes the following contentions:
 
 
 15
 1) Brown's area supervisor, Mr. Roseman, orally agreed with the union several years before Brown's firing not to discipline employees for bad welds discovered before the operators could observe the weld. This worked out to six inches of "free welds" on many machines. Brown's final bad weld was only four inches long, and Mook alleges that Brown was the only operator disciplined for a bad weld of this length;
 
 
 16
 2) Roseman told Brown and Mook that he did not want Brown to bid for the 1152 position because he did not like Brown and because Brown refused overtime and weekend work;
 
 
 17
 3) Three other 1152 operators, Messrs. Riley, Rose, and Harper, all welded without tips but were not disciplined;
 
 
 18
 4) Another supervisor, Mr. Nitz, told Mook that he was "being pushed" by management to discipline Brown;
 
 
 19
 5) Written warnings against other operators were removed from their records after a few months;
 
 
 20
 6) Roseman sabotaged Brown's machine and left his assigned area to observe Brown.
 
 
 21
 Mook also stated that "I believe that Mr. Brown was discriminated against because of Mr. Brown's race" and that "I believe that Mr. Roseman did everything in his power to terminate Mr. Brown because of his dislike for Mr. Brown, and further because Mr. Brown did not work overtime." Mook provided no additional facts to support any of his contentions. At the arbitration hearing, Roseman contradicted Mook's account of their oral side agreement,[2] and the union official who testified to corroborate it contradicted Mook regarding the meeting place.
 
 
 22
 One of the three operators whom Mook stated had not been punished for welding without a tip, Otis Riley, is black. Riley confirmed at the arbitration hearing that he had welded without a tip twice without receiving a written warning. B & W contended that he did not receive a written warning because he had no other violations at the time of the error. Harper testified at the hearing that he had welded without a tip on some occasions. Harper is not listed as having been disciplined by B & W.
 
 
 23
 The district court gave three reasons for granting B & W's motion for summary judgment on Brown's Title VII claim.[3] First, Brown failed to prove a prima facie case because his work-related reprimands showed that he was not adequately performing his job. Second, the application of the discharge policy established in Rule C-7 was a legitimate, non-discriminatory reason that was not a pretext concealing real discrimination. Finally, an examination of the disciplinary records of the 1041 and 1152 operators submitted by B & W show "no discernable pattern" of discriminatory treatment.
 
 
 24
 The court dismissed the other three claims more summarily. It ruled that claims that a job termination was racially motivated were not cognizable under Sec. 1981 after Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363 (1989). It ruled that the Ohio contract claim was pre-empted by Sec. 301 of the Labor Management Relations Act ("LMRA"), and that the arbitration decision was final and binding. It also held that Brown's intentional infliction of emotional distress claim failed to state a claim under Ohio law, and was also pre-empted by Sec. 301. The arbitration decision also disposed of this claim under Sec. 301 because the only act Brown claims created the distress was B & W's breach of its promise under the CBA that "all duties ... would be issued equally to all employees," and the arbitrator conclusively ruled that B & W did not violate the CBA by firing Brown. Brown's timely appeal followed.
 
 II
 
 25
 We first consider the court's grant of summary judgment in Brown's Title VII claim. Brown claims that he was fired because of his race, not because of his violations of Rule C-7. His argument, and the proof he adduces in support of it, boil down to the contention that violations of Rule C-7 by white 1152 operators were overlooked by B & W's supervisors, and therefore his discipline and subsequent discharge by B & W must have been racially motivated.
 
 
 26
 A plaintiff alleging a violation of Title VII normally must prove that he was qualified for the position he was discharged from in order to state a prima facie case. McDonell Douglas Corp. v. Green, 411 U.S. 792 (1973). We have defined "qualified" in this context to mean "that the individual 'was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative.' " Wilkins v. Eaton Corp., 790 F.2d 515, 521 (6th Cir.1986). On this standard, Brown clearly has not stated a prima facie case, as the district court found.
 
 
 27
 However, a plaintiff who actually is "unqualified" for the position may state a prima facie case[4] for discriminatory discharge under Title VII if other employees who would also be deemed unqualified under an employer's rules are not also discharged. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976).[5] See, e.g., Monroe v. Guardsmark, Inc., 851 F.2d 1065, 1067 (8th Cir.1988) ("An employer may justifiably discharge one who has engaged in unlawful, disruptive, or improper acts against it, but only if the criteria are applied consistently to members of all races"). Therefore, if Brown has produced evidence which, interpreted most strongly in his favor, shows that more than a scintilla of evidence exists to support his claim of unequal application of the rules that led to his discharge, see Anderson v. Liberty Lobby, 477 U.S. 242 (1986), summary judgment is improper and the court must be reversed.
 
 
 28
 We affirm the district court because we find that Brown did not produce specific evidence that would permit a jury, giving him all possible benefits of the doubt, to find in his favor. "The burden on the non-moving party is not a heavy one; he simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial" 10A C. Wright, A. Miller and M. Kane, Federal Practice and Procedure, Sec. 2727. FED.R.CIV.P. 56(e) clearly states:
 
 
 29
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. (Emphasis added).
 
 
 30
 "Mere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." Bryant v. Kentucky, 490 F.2d 1273 (6th Cir.1974). Evidence offered in opposition to a motion for summary judgment that "contains no statements that in any way approach the required specificity ... [in which] no names, dates or locations are given ... do not give rise to a genuine issue of material fact." Liberty Leasing Co. v. Hillsum Sales Corp., 380 F.2d 1013 (5th Cir.1967). See, e.g., Gans v. Gray, 612 F.Supp. 608, 619 (E.D.Pa.1985) (allegation in legal malpractice case that attorney failed to produce material witnesses not sufficiently specific where plaintiff did not provide witnesses' names or state whether they possessed material and relevant evidence); Posey v. Skyline Corp., 702 F.2d 102, 105-06 (7th Cir.), cert. denied, 464 U.S. 960 (1983) (plaintiff's affidavit stating that he did not recall any poster in lunchroom informing workers of rights under ADEA held not specific enough to defeat competing affidavit supported by pictures of the poster in the lunchroom stating the dates such poster was in lunchroom). Such specific facts must be probative and be sufficient, if unopposed, "to permit a reasonable jury to return a verdict for the nonmoving party." Anderson, 477 U.S. at 249; First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968). Brown's evidence is a hodgepodge of conclusory statements and vague allegations, which either cannot lead under any interpretation to the conclusion that race was a factor in Brown's discharge or which are so vague as to make any such conclusion the product of speculation.
 
 
 31
 Brown states in his brief that "[t]he facts supporting Plaintiff's claims are set out in the Deposition of Plaintiff James A. Brown and the Affidavit of Stephen Mook." Looking first at Brown's deposition, we find four allegations. First, he stated that his immediate supervisor examined his work more closely and otherwise harassed him in ways that the supervisor did not do with white operators. Second, Brown also stated in his deposition that, although all 1152 operators operated the 1041 machines at times, he was assigned that task more frequently than were white operators. Third, he stated that this was accomplished in part by assigning him to 1152 machines in areas with less work than those in areas assigned to white operators. Fourth, he stated that a white 1152 operator named Briggs was not punished for a bad weld.
 
 
 32
 None of Brown's facts are sufficiently specific to support an inference of discriminatory application of B & W's rules. He provided no dates or time periods on or within which these events occurred. He provided no statements from supporting witnesses to corroborate that they did occur. He produced no documents supporting these statements. Although a white 1152 operator named Briggs is listed as still working at B & W, Brown did not produce a statement from Briggs supporting his allegation. In fact, Brown specifically stated that he did not observe this incident, although he did see the bad weld later. These allegations are so vague that even taken all together they could not support a verdict for Brown. As such, they are not specific enough to raise more than a scintilla of evidence in support of the claim, and therefore do not defeat B & W's motion for summary judgment.
 
 
 33
 Mook's affidavit also provides no additional specific facts that would permit an inference of any racial motive behind Brown's discharge. Mook essentially makes six statements of fact in his affidavit. Two statements--that written warnings were removed from the records of other welders within a few months, and that Roseman sabotaged Brown's machine and left his assigned work area to observe Brown--are wholly unsubstantiated. Mook provides no details to support these allegations, and does not even aver that he observed these events or were otherwise involved in them. As affidavits in opposition to summary judgment must be made "on personal knowledge," FED.R.CIV.P. 56(e), these statements clearly cannot be considered by this court.[6]
 
 
 34
 Three of Mook's allegations deal with statements or actions that support an inference that management was singling Brown out for discipline. None of them could lead a juror to conclude that Brown was fired because of his race. Mook alleges that Roseman told Brown and Mook that he did not want Brown to bid for the 1152 position. But Mook goes on to state that Roseman said he didn't want Brown to bid for the slot because he did not like Brown and because Brown exercised his contractual right to refuse overtime and weekend work. Thus, the supposed attempt to prevent Brown from becoming an 1152 operator cannot support an inference that Roseman discriminated against Brown because of his race. On the contrary, it provides a wholly non-racial explanation for the allegedly harsh application of Rule C-7 to Brown.
 
 
 35
 The statement that foreman Nitz told Mook he was "being pushed" by management to "write Mr. Brown up" also provides no inference of any racial discrimination. It is wholly consistent with the foregoing explanation that management did not like Brown's attitude toward weekend and overtime work. Finally, the statement that Roseman violated the supposed oral agreement not to discipline operators for some bad welds--assuming as we must the existence of that agreement--is also consistent with the foregoing explanation. Roseman could easily have violated his own oral agreement for the same reasons he didn't want Brown to bid for the job. Neither of those reasons involve racial discrimination.
 
 
 36
 Had Brown provided any evidence that racial discrimination was behind these acts and statements, we would have been compelled to permit a jury to pass judgment upon his alternative theory. He has not done so, either directly or through statements in Mook's affidavit. In none of these cases does Mook or Brown show evidence that the other black 1152 operator, Otis Riley, was also subjected to discriminatory application of the rules. In none of these cases does Mook or Brown refer to any specific statements about Brown's race. "There is not a single fact submitted which supports plaintiff's allegations, yet there are several facts which suggest that just cause existed for his discharge." Marietta v. Cities Service Oil Co., 414 F.Supp. 1029 (D.N.J.1976). In the absence of such evidence, a juror could only conclude that B & W may have fired Brown because it did not like his attitude toward his work. Of course, that explanation was rejected by the arbitrator in Brown's grievance hearing, and that decision is not before us.
 
 
 37
 The final allegation by Mook does involve differential treatment, but cannot give rise to an inference of racial discrimination. Mook stated that three other operators, Riley, Rose, and Harper, all welded without tips but were not disciplined. Unfortunately for Brown's claim, Otis Riley is also black. Failure to discipline the other black 1152 operator cannot give rise to an inference that B & W discriminatorily applied its work rules only against blacks.
 
 
 38
 Brown's and Mook's evidence does not support an inference that Brown was fired because B & W's work rules were discriminatorily applied against blacks. Brown has therefore failed to state a prima facie case that Title VII has been violated, and the summary judgment against his claim must be affirmed.
 
 III
 
 39
 Brown's second claim is that 42 U.S.C. Sec. 1981 prohibits an employer from firing an employee based on that employee's race. Since the district court granted summary judgment, we have decided this precise issue in Prather v. Dayton Power & Light Co., 918 F.2d 1255 (6th Cir.1990), cert. applied for (March 26, 1991). We decided in Prather that claims such as Brown's are not cognizable under Sec. 1981. "A panel of this Court cannot overrule the decision of another panel." Salmi v. Secretary of Health and Human Services, 774 F.2d 685, 689 (6th Cir.1985). See United States v. Davis, 919 F.2d 1181 (6th Cir.1990); Timmreck v. United States, 577 F.2d 372, 376 n. 15 (6th Cir.1978), rev'd on other grounds, 441 U.S. 780 (1979). We decline Brown's invitation to call for an en banc hearing to have the full court pass on the Prather panel's judgment.
 
 IV
 
 40
 Brown's third claim below was that B & W's action in firing him constituted a breach of contract under Ohio law. Brown has not objected in either his brief or his reply brief to the district court's determination that Sec. 301 pre-empts this claim. We have consistently held that failure to raise an issue on appeal constitutes waiver of that issue, McMurphy v. City of Flushing, 802 F.2d 191, 198-99 (6th Cir.1986), and we hold now that Brown has waived any objection to the court's grant of summary judgment on his state breach of contract claim.
 
 V
 
 41
 We affirm the district court's grant of summary judgment in Brown's fourth claim alleging intentional infliction of emotional distress. We do so on the narrow ground that his claim is pre-empted by Sec. 301 of the LMRA, and that the adverse arbitration decision therefore disposes of his claim.
 
 
 42
 While the Supreme Court has held that particular claims of intentional infliction of emotional distress are not pre-empted by Sec. 301, the Court has never stated that all state claims of intentional infliction of emotional distress are not pre-empted. We have applied Sec. 301 pre-emption analysis in published opinions to state claims of intentional infliction of emotional distress four times since the Supreme Court's decision in Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399 (1988). Our most recent case established the following rule governing such an application:
 
 
 43
 [T]o avoid section 301 preemption of an intentional infliction of emotional distress claim, the state tort must be " 'either unrelated to the employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself.' "
 
 
 44
 Fox v. Parker Hannifin Corp., 914 F.2d 795, 802 (6th Cir.1990), quoting Beard v. Carrollton R.R., 893 F.2d 117, 123 (6th Cir.1989), quoting Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25, 430 U.S. 290, 305 (1977).
 
 
 45
 Brown's claim is related to the discrimination: in fact, his claim is precisely that to fire a person because of the color of his skin is "outrageous" behavior that is cognizable under the tort of intentional infliction of emotional distress. He does not state that B & W abused him, verbally or otherwise, at work. He merely alleges that his work assignments and discharge were discriminatory and a tort. We have failed to find Sec. 301 pre-emption in cases involving a claim of intentional infliction of emotional distress only when the claim was independent of the alleged violation of the CBA. See Knafel v. Pepsi-Cola Bottlers of Akron, Inc., 899 F.2d 1473, 1483 (6th Cir.1990); O'Shea v. Detroit News, 887 F.2d 683, 687 (6th Cir.1989). Brown's claim is not independent of his claim that the terms of the CBA were violated, and it is therefore pre-empted by Sec. 301.
 
 
 46
 It is a fundamental premise of federal labor law that when parties to a CBA bargain for an arbitrator's decision to resolve disputes arising under the CBA, that arbitrator's decision is binding on the parties absent extreme circumstances. See United Paperworkers International Union, AFL-CIO v. Misco, Inc., 484 U.S. 29 (1987). The arbitration decision conclusively established that B & W did not violate the CBA. Neither party contends that we should not enforce the arbitrator's decision. That decision therefore stands as a final and conclusive determination of Brown's right to his job under the CBA, and Brown's claim must be dismissed.
 
 VI
 
 47
 For the foregoing reasons, the district court's grant of summary judgment on all four of Brown's claims is AFFIRMED.
 
 
 
 *
 The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Brown violated Rule C-7 two more times during the period under question, but was given only a verbal warning on those occasions. Verbal warnings have no adverse effect on an employee's tenure
 
 
 [2]
 Roseman testified that he had agreed in the 1970s not to discipline 1041 operators for bad welds of less than 30 or 36 inches because the operators could not see the mistake until then
 
 
 [3]
 Brown's response to B & W's motion, including the evidence described above, was untimely. However, the court noted that it would have granted B & W's motion even had the response been timely. Without holding that Brown's response and affidavits are properly before us, we affirm the granting of B & W's motion even after considering them
 
 
 [4]
 It can be argued that the McDonald test states a method whereby plaintiff can demonstrate pretext rather than a prima facie case. The Court in McDonald assessed whether a claim for discriminatory application of work rules can state a Title VII violation, and reinstated the complaints after ruling that it could. We have treated claims for discriminatory application as a method of stating a prima facie case. Stotts v. Memphis Fire Department, 858 F.2d 289, 298 (6th Cir.1988). See e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir.1984) (discriminatory application claim establishes a prima facie case)
 
 
 [5]
 "While Santa Fe may decide that participation in a theft of cargo may render an employee unqualified for employment, this criterion must be 'applied, alike to all members of all races,' and Title VII is violated if, as petitioners alleged, it was not." McDonald, 427 U.S. at 283
 
 
 [6]
 Even if Mook's statement regarding Roseman's actions could be considered, Mook concluded that paragraph of his affidavit with the statement "I believe Mr. Roseman did everything in his power to terminate Mr. Brown because of his dislike for Mr. Brown, and further because Mr. Brown did not work overtime." (Emphasis added). As such, a reasonable juror could not draw an inference that Roseman's actions were motivated by anything other personality differences and work disagreements. These might be violations of the CBA, but the arbitrator sided with B & W