NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0485n.06

No. 23-3105

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Nov 27, 2023
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| WEIJIE LU, | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| UNIVERSITY OF DAYTON, | ) | DISTRICT OF OHIO |
|     Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |
| | ) | |
| | ) | |

Before:  SUTTON, Chief Judge; CLAY and LARSEN, Circuit Judges.

**CLAY, Circuit Judge.**  Plaintiff Weijie Lu appeals the district court's decision to grant in part Defendant University of Dayton's motion for summary judgment.  Lu contends that he presented sufficient evidence to survive summary judgment. Specifically, Lu claims that Defendant:  (1) discriminated against him on the basis of his race and/or national origin, and (2) retaliated against him for reporting alleged discrimination against a Dayton graduate student and/or filing charges with the Ohio Civil Rights Commission.  For the reasons set forth below, we **AFFIRM** the district court's order granting in part Defendant's motion for summary judgment.

## BACKGROUND

### I.  Factual Background

Plaintiff Weijie Lu is an experienced physics teacher of Chinese descent.  From 2014 to 2020, Lu taught introductory physics classes as an adjunct professor at the University of Dayton. However, the facts underlying this case begin in 2012, prior to Lu's employment by Defendant,

when Lu served as a technical advisor through the Air Force Research Laboratory ("AFRL") at the Wright Patterson Air Force Base. Dayton offers graduate students the opportunity to apply for the Defense Associated Graduate Student Innovators program ("DAGSI"), which is funded through the Ohio Department of Education and the United States Air Force. A Dayton graduate student, Sorrie Ceesay, participated in this fellowship program and worked on DAGSI-funded research under Lu's mentorship. For the majority of Lu's time serving as Ceesay's advisor at the AFRL, he was not employed as an adjunct professor at Dayton. Towards the end of his mentorship of Ceesay, Lu started working as an adjunct professor at Dayton in August 2014.

The AFRL terminated Lu in 2018. After his termination, he sent an e-mail to the Dayton Equity Compliance Office, stating, "I am an adjunct faculty in physics, and I lost my job and career at the Air Force Res Lab due to government corruption and discrimination . . . . Would you please [] educate me on the EEO laws . . . . (I have an attorney)." Bakota Aff., R. 8-1, Page ID #44. Amy Zavadil, the then-current Title IX Coordinator in the Equity Compliance Office at Dayton, replied and directed Lu to the local EEOC office. Nonetheless, Lu continued to reply, "seeking advice on [his] case with Air Force Res Lab." *Id.* Kimberly Bakota, a civil rights investigator at Dayton, subsequently replied in September 2018, also advising Lu to contact the local field office and explaining that Dayton could not assist with a claim against the AFRL, as the two entities operated as separate institutions.

Then, during his time as an adjunct professor in 2019, Lu learned that his former mentee Ceesay was terminated from his research position with the AFRL because he was allegedly not a United States citizen when, in fact, Ceesay was a United States citizen. Believing such treatment was due to Ceesay's African-American race, Lu e-mailed Dayton on January 28, 2020, and expressed his concern regarding the AFRL's allegedly discriminatory acts. In relevant part, Lu

claimed that "[t]he termination of Mr. Sorrie[] Ceesay was a typical Jim Crow civil rights violation and a constitutional violation, and it was at US Air Force in 2014." *Id.* at Page ID #47. Bakota once again replied that Dayton could not advise Lu or Ceesay on issues pertaining to discrimination claims against AFRL and directed him to the local field office of the EEOC. In addition to Bakota's reply, Scott Segalewitz, Associate Dean for Experiential Learning and Student Success, accidentally replied all and copied Lu, stating that "Mr. Lu just called and gave me an earful. . . . Good Luck, Paul."[1] *Id.* These e-mails from Lu to various Dayton administrators regarding the alleged discrimination towards Ceesay occurred between January 28, 2020 and February 7, 2020.

About a month later, March 2020 marked the beginning of the COVID-19 pandemic. The adjunct professors, including Lu, were notified in April that "[a]djuncts are currently under review by the Dean and the Provost" because of the uncertainty caused by the pandemic. Erdei Aff., R. 9-1, Page ID #60–61. The former chair of the Physics Department, John Erdei, e-mailed Lu about the undetermined future for adjuncts, stating: "I need you to know that the fall is now uncertain. Most certainly, if I learn anything I will certainly let you know." *Id.* at Page ID # 61. Erdei also followed up with Lu in June, advising him that fall adjunct contracts were still unsettled and explaining he may know more in July.

Concrete answers finally arrived in July 2020, and Lu was informed that a tenured professor would be teaching his previously assigned physics classes for the upcoming fall 2020 semester due to COVID-19 uncertainty and budgetary constraints. Dayton made the decision in summer 2020 to replace all Physics adjunct professors with tenured ones in order to minimize

---

[1] "Paul" refers to Dayton's former Provost and Executive Vice President of Academic Affairs, Paul H. Benson. Unsatisfied with Dayton's replies, Lu stated he was going to escalate his complaints to the Provost, which caused Segalewitz to state "Good Luck, Paul." Aff. Bakota, R. 8-1, Page ID #47.

costs, as the tenured professors were already covered within the university's budget. Accordingly, a tenure-track professor, Ivan Sudakow, took over Lu's introductory physics class. Lu's loss of his adjunct teaching contract, while Dayton allegedly retained other similarly-situated temporary professors, forms the basis for his first adverse employment action allegation. Lu also believes that this first adverse employment action constituted retaliation for his report regarding the AFRL's discrimination towards Ceesay.

After Lu's adjunct professor contract was not renewed, Erdei encouraged him to apply for a full-time professor position. As suggested, in February 2021, Lu applied for a professor position in Dayton's Electro-Optics and Photonics department. After reviewing about 40 applications, Lu's application was rejected in the initial screening phase along with 29 other candidates due to his "[w]eak research record." Sarangan Aff., R. 10-1, Page ID #70–71, 79. According to his application, Lu's last publication was over five years ago, and the position required "[a] very good record of refereed journal and conference publications," among other listed "Minimum Qualifications." *Id.* at Page ID #71, 74.

Lu disputes that he was unqualified and further claims that the candidate ultimately selected for the professor position did not meet the qualifications. Therefore, Lu also points to the search committee's failure to hire him as a second adverse employment action, highlighting that he is Chinese, while the successful candidate, Swapnajit Chakravarty, is Indian. Lu believes this ultimate employment decision was based on either national origin discrimination or was in retaliation for his discrimination complaint regarding Ceesay.

## II. Procedural History

Based on the non-renewal of Lu's adjunct professor contract in the summer of 2020 and his non-selection for the full-time professor position in February 2021, Lu filed a complaint in the

U.S. District Court for the Southern District of Ohio on April 8, 2022, alleging race and national origin discrimination in contravention of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (hereinafter "Title VII"); retaliation in contravention of Title VII; and promissory estoppel claims. The complaint explains that Lu filed two charges with the Ohio Civil Rights Commission ("OCRC") and the EEOC: (1) the first charge, filed on January 5, 2021, alleged that the termination of his adjunct professor contract stemmed from discrimination on the basis of race, age, and/or retaliation regarding Lu's complaint about Ceesay; (2) the second charge, filed on March 30, 2021, alleged that Dayton's failure to hire was due to discrimination on the basis of age and/or retaliation regarding Lu's complaint about Ceesay.[2]

Defendant moved for summary judgment on all claims the same day it answered Plaintiff's complaint. Following additional limited discovery, Lu responded in opposition to the motion. The district court granted Defendant's motion for summary judgment in part as to the Title VII claims and denied the motion as to Plaintiff's promissory estoppel claim. With the Title VII claims dismissed, no federal question remained. Therefore, the district court declined to exercise supplemental jurisdiction over the promissory estoppel claim alone and dismissed the complaint without prejudice for refiling in state court. Plaintiff thereafter filed a timely appeal in this Court.

In dismissing Plaintiff's Title VII discrimination claims, the district court viewed Plaintiff's failure to establish a prima facie case of Title VII discrimination as dispositive and declined to address whether Lu exhausted his administrative remedies.[3] For the non-renewal of

---

[2] Although Lu brings age discrimination claims in his OCRC charges, he abandons these claims in his complaint and on appeal.

[3] This Court will likewise assume without deciding that Lu exhausted his administrative remedies. Regardless of whether Lu exhausted his administrative remedies as to his failure to hire claim, this Court may dispose of the claim on the merits. *See Fort Bend County v. Davis*, 139 S.

his adjunct professor contract, the district court held that Lu "cannot establish that he was qualified for the position nor can he show that [Dayton] treated him differently than a similarly-situated, non-protected employee." Order, R. 28, Page ID #317–18. Because Dayton did not retain any adjunct faculty in the Physics Department and because visiting professors were not similarly situated to adjunct professors, the court dismissed Lu's Title VII claims related to his loss of his adjunct professor position. For Lu's failure to hire claim, the district court held that Lu did not establish that he was qualified for the position. Because Lu did not have a "very good record of refer[eed] journal and conference publications," he was fairly eliminated from the applicant pool during the initial screening. *Id.* at Page ID #320. Therefore, the court also dismissed Lu's Title VII claims related to his non-selection for the full-time professor position.

Finally, the court turned to Lu's retaliation claims and dismissed them for both the non-renewal of his contract and failure to hire claim because Lu failed to demonstrate pretext for both adverse employment actions. Persuaded by Dayton's reasoning for both actions, the district court held that Lu failed to create a genuine issue of material fact demonstrating that the COVID-19 pandemic did not inform the decision to decline to renew his adjunct contract, or that his lack of a publication record did not inform the decision to select an alternate candidate for the Photonics job.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision granting summary judgment. *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020). A court may grant summary judgment if there is "no genuine dispute as to any material fact" and the moving party "is entitled

---

Ct. 1843, 1851 (2019) ("Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts.").

to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Rafferty v. Trumbell County*, 915 F.3d 1087, 1093 (6th Cir. 2019). When considering a motion for summary judgment, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020) (quoting *Burgess v Fischer*, 735 F.3d 462, 471 (6th Cir. 2013)). "[A]t the summary judgment stage the judge's function is not . . . to reweigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

## I. Lu's Discrimination Claims

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Because Lu relies only on circumstantial evidence, as opposed to direct evidence, of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).[4]

---

[4] A Title VII plaintiff "may establish a claim of discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster*, 746 F.3d at 726. The only allegedly direct evidence introduced in this case is Segalewitz's statement that Lu "gave [him] an earful." Bakota Aff., R. 8-1, Page ID #42, 47. Although this statement may have been offensive to Lu, such a statement was not tied to a protected characteristic. Therefore, we analyze this case through the lens of the burden-shifting framework, which requires Lu to articulate a prima facie case of discrimination.

To establish a prima facie case of race or national origin discrimination, Lu must show that he: (1) is a member of a protected class; (2) was qualified for the position and performed it satisfactorily; (3) suffered an adverse employment action; and (4) was replaced by a person outside of the protected class or was treated less favorably than a similarly-situated individual outside of the protected class. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000). The district court held that Lu could not make out a prima facie case that he was discriminated against, and its analysis thus stopped at this first phase of the burden-shifting framework.

Assuming a plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 573. If the defendant carries the burden, then the plaintiff has the opportunity to prove that the proffered reason was actually pretext to hide unlawful discrimination. *Id.*

### A. Non-renewal of Lu's Adjunct Contract

In response to the uncertainties posed by the COVID-19 pandemic, Dayton did not renew Lu's adjunct contract to teach introductory physics for the 2020 fall semester. Contesting Dayton's motivations, Lu argues that Dayton did not renew his adjunct teaching contract on the basis of his race or national origin. We evaluate each prong of Lu's prima facie case in turn.

#### i. *Protected Class*

The parties do not dispute that Lu is a member of a protected class for purposes of Title VII. Lu is an Asian American of Chinese descent and would therefore be protected under the national origin and/or race categories.

ii. *Qualified for the Position*

On appeal, the parties do not dispute that Lu was qualified to teach the introductory physics classes at Dayton. In fact, Lu taught these types of classes for the past six years, indicating he was both qualified and performing his job satisfactorily.

iii. *Adverse Employment Action*

The parties do not dispute that Lu faced an adverse employment action—the failure to renew his adjunct professor contract for the fall 2020 semester. Failure to renew a contract, even a contract to which an individual has no future entitlement, might still qualify as an adverse employment action. *See, e.g.*, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 500–01 (1st Cir. 2009) (holding that the nonrenewal of a university employee's contract was an adverse employment action despite the fact that the employer's decision was completely discretionary). Neither party argues that the failure to renew Lu's contract is *not* an adverse employment action.

iv. *Similarly Situated Individual Outside of The Protected Class*

The crux of the parties' dispute regarding Lu's prima facie case lies in the fourth and final prong. Without pointing to any evidence, Lu argued in front of the district court that he was the only adjunct professor who was not extended a contract for the fall 2020 semester. Lu further claimed that he was treated differently than a visiting professor whose teaching contract was renewed, despite not having prior budget approval, for the fall 2020 semester. Lu did not argue that the visiting professor was outside of his protected class; he solely contended that he was similarly situated and treated differently.

Dayton countered that the Physics Department did not extend *any* contracts to adjunct professors for the fall 2020 semester or the spring 2021 semester, and several other departments also lost adjuncts in the wake of the pandemic. Additionally, Dayton hired the visiting professor

in 2019 on a two-year contract that *included* 2020 to substitute for a full-time faculty member pursuing a fellowship in Europe. Finally, Dayton explicitly highlighted that Lu failed to illustrate the visiting professor was both similarly situated *and* outside of his protected class.

Importantly, the record reflects that Lu's department at Dayton did not retain any adjunct professors for the fall 2020 semester. As for the comparator visiting professor, both parties cite the same pages of the deposition of John Erdei to support their contentions, indicating a factual dispute between the possible interpretations. In relevant part, Erdei's deposition states:

> Q: So in summer 2020, did the physics department hire any visiting professors?
>
> A: We had an existing visiting professor at that time . . . .
>
> Q: And you said there was one visiting professor for the summer of 2020?
>
> A: Again, he didn't teach in the summer of 2020. He taught during the academic year, but he was hired the year before. We had a faculty member that was a Madame Curie fellow, went to Europe for two years . . . . The visiting professor was, in fact, hired to cover the load for the guy that went to the fellowship. . . .
>
> Q: And he was hired in the summer of 2020?
>
> A: No. He was hired before that. I think Bob went on his internship before that, so I would guess that he was hired for the fall of maybe '19, possibly.
>
> Q: Is the fall of 2019 the only time he taught classes?
>
> A: No. They are hired for a full year, and he was renewed again. Bob Greco was on an internship for two years.
>
> Q: So Dr. Ojha taught in the spring of 2020?
>
> A: Yes.
>
> Q: And he taught in the fall of 2020?
>
> A: Yes.

Erdei Dep., R. 20, Page ID #190–93.

There are at least two possible interpretations of this deposition testimony: one would indicate that visiting professor, Dr. Ojha, was hired in fall 2019 for a two-year contract, ending in the fall semester of 2021; the second would indicate that Dr. Ojha was hired in fall 2019 for a

contract that was *re-considered* and *renewed* for fall 2020 (to continue filling in for the absent tenured professor). The former interpretation would be easily distinguishable from an adjunct professor's contract, while the latter interpretation may be similar, which would potentially allow Lu to point to Dr. Ohja as a similarly situated comparator. The answers to these ambiguities are not apparent from the record. However, Lu fails to recognize an essential distinguishing factor— Dr. Ojha was hired to fill the shoes of a tenured professor on a multi-semester leave, while Lu was contracted on a semester basis.

Even resolving this ambiguity in favor of Lu, he failed to produce any facts that visiting professor Dr. Ojha was outside of his protected class. Lu did not state that Dr. Ojha was outside of his protected class in his complaint, his response to Defendant's motion for summary judgment, his initial brief on appeal, or his reply brief. Both the district court and Lu fixated on the differences (or lack thereof) between visiting professors and adjunct professors, neglecting altogether to merely state that the visiting professor was of any other national origin than Chinese.[5] The prima facie case is not adequately stated for this claim if Lu cannot establish that he was treated differently than a similarly situated individual *outside of his protected class*. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (affirming summary judgment against plaintiff's race and age discrimination claims for failure to present *affirmative* evidence that similarly situated non-minority employees were treated differently). Regardless of whether an adjunct professor and a visiting professor are similarly situated, failure to point to facts indicating that the visiting

---

[5] Further, Lu clearly understood how to adequately plead this element of the prima facie case, as he did so explicitly for his failure to hire claim. (Pl.'s Response to Mot. Summ. J., R. 23, Page ID #253 ("Finally, Dr. Lu satisfies the last prong of the *prima facie* case because Dr. Chakravarty is a person outside of Dr. Lu's protected class and was similarly qualified for the Photonics Job.")).

professor was outside of Lu's protected class is fatal to his prima facie case for this portion of his Title VII discrimination claim.[6]

Therefore, the district court reached the correct result as to Lu's first discrimination claim. Lu failed to make the necessary showing that he was replaced by an individual outside of his protected class or that a similarly situated individual outside of his protected class was treated differently than him.

### B. The Full-time Professor Position

Lu's second discrimination claim alleges that Dayton did not select him for the full-time professor position on the basis of his race or national origin. Instead, Dayton's hiring committee selected Swapnajit Chakravarty for the associate professor position in February 2021. We again evaluate each prong of Lu's prima facie case in turn.

#### i. *Protected Class*

As with Lu's first discrimination claim, the parties do not dispute that Lu is a member of a class protected by Title VII.

#### ii. *Qualified for Position*

The parties heavily contest whether Lu was qualified for the full-time teaching job to which he applied. Lu argued that he "met the minimum qualifications for the Photonics job because he holds a Ph.D. in Physics and had a successful record of teaching." Pl.'s Resp. to Mot. Summ. J., R. 23, Page ID #253. In support, Lu attached as an exhibit to his opposition to Defendant's motion for summary judgment the original job posting he found online for the Photonics teaching position.

---

[6] Lu also fails to show that the full-time professor, who took over his fall 2020 classes due to budgetary concerns, was outside of his protected class.

Dayton submitted the rubric under which the selection committee made its hiring decisions for the full-time Photonics teaching position. This qualifications rubric is largely identical to the online posting, but it includes additional sub-bullets where the committee further defined the qualifications prior to evaluating any applicants. For example, the rubric states under "Minimum Qualifications" that candidates must possess "[a] very good record of refereed journal and conference publications." Sarangan Aff., R. 10-1, Page ID #71. The rubric further defines this qualification in a sub-bullet: "[i]f coming from academia, average of 1 top journal paper per year in the last 3 years; if coming from industry, we will consider patent as comparable publication record." *Id.*

Not only did Lu lack any publications within the past five years, but he also lacked any recent patents, as his last two patents were from 2004. Lu does not offer any evidence to dispute that he did not meet either of these criteria as defined by the search committee's more specific rubric. Therefore, Lu has not shown that he was objectively qualified, as the evidence viewed in the light most favorable to Lu indicates that he did not have *any* recent publications or patents, which is a required component of a graduate professor's credentials. *See Alexander v CareSource*, 576 F.3d 551, 563 (6th Cir. 2009) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575–76 (6th Cir. 2003) (en banc)) ("The prima facie burden of showing that a plaintiff is qualified can . . . be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field.").

Lu then argues that, even if he did not meet the qualifications of the job, neither did the candidate ultimately selected. The Minimum Qualifications also required applicants to possess a "very good record of effective teaching as instructor at the graduate level in EOP, ECE or related disciplines." Sarangan Aff., R. 10-1, Page ID #74. As with the research qualification, the search

committee further defined this teaching qualification to require "[e]vidence of teaching at least one graduate level course," as well as a "[d]emonstration of communication via video interview presentations." *Id.*

To illustrate that Chakravarty did not meet this Minimum Qualification, Lu points to a spreadsheet that includes each member of the search committee's thoughts and notes on Chakravarty's interviews. In relevant part, one search committee member pointed out in the "cons" section of his notes that Chakravarty had "NO demonstrated teaching experience." Pl.'s Resp. to Mot. Summ. J., R. 23-9. This same search committee member's notes change on the second interview to state that Chakravarty does not have "much real teaching experience," instead of no teaching experience, indicating that Chakravarty at least had some type of teaching experience. *Id.* All other search committee members state or imply that Chakravarty has some form of teaching experience, including that he "[was a] TA while grad student," "[h]as taught with Ray Chen," "[is or was] a sub teacher," or "[had] limited experience." *Id.*

A plaintiff may make out a prima facie case of discrimination on the basis of an unequal application of the search committee's hiring rubric. *See Brown v. Babcock & Wilcox*, No. 90-3918, 1991 WL 112813, at *4 (6th Cir. 1991) ("[A] plaintiff who actually is 'unqualified' for the position may state a prima facie case for discriminatory discharge under Title VII if other employees who would also be deemed unqualified under an employer's rules are not also discharged."); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 465 (6th Cir. 2003). However, as in *Brown*,[7] Lu has not produced evidence which, interpreted most strongly in his favor, "shows that

---

[7] Further, unlike in *Seay*, neither Chakravarty's nor Lu's curriculum vitae or resumes are in the record. Based on the evidence and the deposition testimony in *Seay*, the plaintiff demonstrated that two applicants who were not screened out of the interview pool were unqualified. 339 F.3d at 465–68. Neither applicant had the required degree, and one of the applicants did not have the required six years of health and safety experience. *Id.* at 466. Further,

more than a scintilla of evidence exists to support his claim of unequal application." 1991 WL 112813, at *4; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Lu leans heavily on one search committee member's initial mental impression that Chakravarty had "[no] demonstrated teaching experience," ignoring that all of the other members indicated he had some type of teaching experience. However, on appeal, Lu acknowledges that "the search committee noted Chakravarty was a substitute teacher during graduate school." Pet'r's Reply Br., ECF No. 18, 8. Additionally, Lu fails to recognize that these were the search committee's mental impressions during Chakravarty's call back interviews—not during the initial assessment of candidates' applications to eliminate those who do not meet the Minimum Qualifications. Therefore, Lu did not produce any evidence that supports his claim of unequal application at the initial screening phase. *See Brown*, 1991 WL 112813, at *4. There is no evidence in the record to indicate Chakravarty's application and curriculum vitae did not meet the Minimum Qualifications and should have been similarly screened out prior to receiving an interview. Additionally, there is no evidence that Dayton applied its specific "research experience" qualification in a way that was inconsistent, arbitrary, or pretextual.

iii. *Adverse Employment Action*

The parties do not dispute that failure to hire may be considered an adverse employment action. 42 U.S.C. § 2000e-2(a)(1); *see, e.g.*, *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1061 (6th Cir. 2022).

---

the manager who reviewed the applications conceded he could not point to the relevant experience required by the posted job's qualifications on one applicant's resume. *Id.* at 467. Lu has not submitted any evidence that parallels the evidence in *Seay* and illustrates the qualifications were disparately applied. The selection committee's mental impressions of Chakravarty's interview each differ and change over the course of the two interviews and indicate that he had some type of teaching experience.

iv. *Similarly-Situated Individual Outside of The Protected Class*

Unlike Lu's argument regarding the non-renewal of his adjunct professor contract, Lu successfully pleads that an individual outside of his protected class was selected for the full-time Photonics teaching position. The candidate selected, Chakravarty, was of Indian descent—a different national origin than Lu. Regardless, because Lu cannot show that he was qualified for the Photonics job, he has failed to make out a prima facie case of discrimination based on Dayton's failure to hire him.

## II. Lu's Retaliation Claims

In addition to Title VII's discrimination provision, Title VII also prohibits an employer from retaliating against an employee because of the employee's assertion of his Title VII rights. 42 U.S.C. § 2000e-3. Similarly to a Title VII discrimination claim, a Title VII retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Medical Prods.*, 515 F.3d 531, 543 (6th Cir. 2008). In this case, Plaintiff has presented the latter. Thus, we analyze Plaintiff's retaliation claims under the familiar *McDonnell Douglas* burden-shifting framework. 411 U.S. 792.

To establish a prima facie case of retaliation, Lu must show: (1) that he engaged in activity protected by Title VII; (2) that the relevant decisionmakers at Dayton knew that Lu engaged in the protected activity; (3) that Dayton subsequently took an adverse employment action against him; and (4) that there was a causal connection between the protected activity and the adverse action. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007). Once a plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to identify a legitimate, non-retaliatory reason for taking the adverse employment action. *See id.* at 597.

Finally, the plaintiff has the opportunity to demonstrate that the proffered non-retaliatory reason was mere pretext. *Id.*

Lu could demonstrate that Dayton's legitimate, non-retaliatory reasons were pretext in several different ways, including by illustrating (1) the proffered reason has no basis in fact; (2) the proffered reason did not actually motivate the defendant's challenged conduct; or (3) the proffered reason was insufficient to warrant the challenged conduct. *Id.* The ultimate inquiry in using any of these three methods is an assessment of whether the "employer made up its stated reason to conceal intentional retaliation." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (alteration omitted). The plaintiff's burden is not heavy, as summary judgment is warranted solely if no reasonable juror could conclude that the employer's offered reason was pretextual. *George*, 966 F.3d at 462.

The district court assumed that Lu could make out a prima facie case and granted summary judgment in favor of Dayton on both retaliation claims by reasoning that Lu could not show pretext. We agree.

## A. Non-Renewal of Lu's Adjunct Professor Contract

Lu argues that, because "everyone from Provost Benson down to Dr. Lu's supervisor, Dr. Erdei, [was] aware Dr. Lu made a discrimination report," his Ceesay discrimination complaint resulted in the termination of his adjunct teaching contract. Pl.'s Resp. to Mot. Summ. J., R. 23, Page ID #256. Although Lu likely could not make out the causation prong of his prima facie case, the analysis of causation and pretext significantly overlap. *See Cantrell v. Nissan N. Am., Inc.*, 145 F. App'x 99, 107 (6th Cir. 2005) (noting that evidence offered to establish causation can also serve to establish pretext). Therefore, we begin, as the district court did, with the assumption that Plaintiff has shown a prima facie case.

Dayton proffered a legitimate, non-retaliatory reason by explaining that budgetary constraints and uncertainty imposed upon the university by COVID-19 caused the non-renewal of Lu's adjunct professor contract. Lu has not shown that these concerns were pretextual. At the beginning of 2020, Dayton conditionally set Lu's classes for the fall 2020 semester, *after* his complaints of alleged discrimination and *prior to* the budgetary concerns raised by the pandemic arose.[8] Adjunct professor contracts are approved after this preliminary class schedule "somewhere in the July timeframe." Erdei Dep., R. 20, Page ID #165. Between March and July 2020, the pandemic's uncertainties caused Dayton to have "town hall meetings about the pandemic, and budget problems, and freezes on hiring," as there existed "a real concern in the town halls that the students . . . were not going to return in the fall out of fear of the pandemic." *Id.* at Page ID #171–72. Erdei e-mailed Lu twice, keeping him apprised of the developing situation and warning him that adjunct contracts were not guaranteed.

To show pretext, Lu argues, without providing any corresponding evidence, that Dayton did not let go of any other faculty due to the COVID-19 pandemic. However, the record contains unrebutted evidence that Dayton terminated the contracts of all adjunct professors in the Physics Department, as well as the contracts of certain adjunct professors in other departments—not just Lu's or those who engaged in protected activity.

Lu also attempts to show pretext by highlighting purported inconsistencies within Dayton's financial reasons for his contract non-renewal. Lu argues that, because the Dayton budget office never officially denied a request to renew his adjunct contract, Dayton's justification was pretext. Lu fails to explain the salience of a formal budget denial from Dayton's budget office. With or

---

[8] This timeline undercuts any purported causal connection, indicating that Dayton intended to renew Lu's contract before the pandemic intervened.

without a formal denial from Dayton's budget office, the record indisputably shows Erdei was instructed to redistribute the adjunct faculty classes to tenured professors, out of respect for the ongoing budgetary fears. Because Erdei was instructed to redistribute courses, no ultimate budget approval was needed, as no adjunct contracts were issued. Following the non-renewal of Lu's contract, Erdei even offered to stay in touch with Lu after the fall 2020 semester and encouraged Lu to apply for a full-time job with the university—these are not the actions of an employer acting with a retaliatory motivation.

### B. Photonics Job

Lu argues that both his discrimination complaint regarding Ceesay, as well as his January OCRC charge, illegally informed Dayton's decision to not hire him. Lu's OCRC and EEOC charges are undisputedly protected activity under Title VII. *See Weeks v. Mich., Dept. of Comm. Health*, 587 F. App'x 850, 858 (6th Cir. 2014). Additionally, we will assume without deciding that Lu engaged in protected activity when he reported perceived discrimination by the AFRL to Dayton. *See Laster*, 746 F.3d at 730 (noting that the opposition clause portion of Title VII protects less formal protests of discriminatory employment practices).

The Photonics professor job search committee was composed of Andrew Sarangan and six additional professors, none of whom are individuals that received Lu's e-mailed complaints regarding Ceesay and the AFRL program. At the time of the initial screening of the applicants' qualifications, Sarangan and the search committee did not discuss and were not aware of Lu's pending charge against Dayton or any OCRC case. Sarangan first learned of any OCRC or EEOC charge against Dayton when Lu filed his complaint in district court. Lu does not offer any evidence disputing that the search committee for the Photonics position was completely unaware of any protected activity in which he engaged. *Cf. Slusher v. USPS*, 731 F. App'x 478, 480–81 (6th Cir.

2018) (affirming summary judgment where, although there may have been institutional knowledge as to the plaintiff's protected activity, the three ultimate decisionmakers were unaware).

Therefore, there is no evidence in the record that the search committee was aware Lu engaged in any form of protected activity. His prima facie case for retaliation as related to his failure to hire claim thus falters at the second prong. Additionally, the search committee's lack of knowledge as to Lu's OCRC charge or Lu's Ceesay complaints breaks the causal chain, as they could not make a decision based upon facts of which they were unaware.

Even assuming, as the district court did, that Lu could make out a prima facie case of retaliation for his failure to hire claim, he cannot establish pretext. Dayton has offered a legitimate, non-retaliatory reason for Lu's non-selection—he had no recent publications or patents. In fact, the selection committee's notes illustrate that they eliminated multiple candidates for "[w]eak research record[s]." Sarangan Aff., R. 10-1, Page ID #79. In response, Lu argues a disparate application of the qualifications rubric shows that his lack of recent scholarship is pretextual. Lu contends that "[t]hroughout the committee review process and interview process, [Dayton] faculty noted Dr. Chakravarty had no teaching or mentoring experience which was clearly listed as a minimum qualification." Pl.'s Resp. to Mot. Summ. J., R. 23 Page ID #255.

Lu fails to address that Chakravarty *did* meet the minimum qualifications. Teaching experience, under the rubric, required an applicant to have taught just one graduate level course. Chakravarty did teach at least one graduate level course, and evidence is in the record indicating as much. Even assuming that Chakravarty taught at the level of a substitute teacher or TA (which may be less experience than desirable), Lu does not offer evidence indicating Chakravarty should have been screened out at the initial stage, instead of being offered an interview. Lu offers

insufficient evidence to dispute that Chakravarty was qualified, or to prove that he himself was qualified.

The university that encouraged Lu to apply for a full-time position did not invent an assessment criterion to retaliate against Lu or apply the criteria in a disparate manner—Chakravarty was qualified; Lu was not. Therefore, the evidence supports Dayton's non-retaliatory reason for not offering Lu the full-time professor job. *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (emphasizing that the role of federal courts is "to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments") (quotation omitted); *Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2006) ("[T]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.").

## CONCLUSION

The district court did not err in granting summary judgment in favor of Defendant Dayton related to Plaintiff Lu's discrimination and retaliation claims. For the reasons set forth above, we **AFFIRM** the judgment of the district court.